UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT A. FORTE,

        Plaintiff,                           Case No. 08-15206
                                         Paul D. Borman
v.                                    United States District Judge

                                         Virginia M. Morgan
MARK C. McQUIGGAN,             United States Magistrate Judge

          Defendant/
          Third Party Plaintiff,

v.

STANLEY J. TARGOSZ, JR.,

          Third Party Defendant.
_____/

## AMENDED ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING THE CASE WITH PREJUDICE[1]

      This matter is before the Court on Defendant Mark C. McQuiggan's Motion for Summary Judgment. (Dkt. No. 27.) Plaintiff filed a Response (Dkt. No. 31) and Defendant filed a Reply (Dkt. No. 33.) The Court held a hearing on August 25, 2010. For the reasons that follow, the Court GRANTS Defendant's motion for summary judgment.

**INTRODUCTION**

      This case involves Plaintiff Forte's claim that he was duped by Defendant McQuiggan into giving $100,000 to a third party Raymond Michael (who is not named in this suit) in return for an

---

[1] The Court enters this Amended Order solely to clarify the disposition of Defendant's Third-Party Complaint against Third-Party Defendant Stanley Targosz.

improperly executed promissory note, to which Defendant was not a party. Both Plaintiff and Defendant are medical doctors who claim to have loaned money in support of, or invested in, a fraudulent scheme perpetrated in large part by individuals who are not parties to this case. In essence, Plaintiff claims that Defendant was an agent/seller of securities for the party who perpetrated the "securities fraud" and that Plaintiff accepted the promissory note, and loaned $100,000 to the PRSI, in reliance on representations allegedly made by Defendant regarding the trustworthiness of Michael, the main perpetrator of the scheme.

Defendant moves for summary judgment on Plaintiff's claims, arguing that Plaintiff's claims are barred by the statute of limitations. Defendant further argues that, even if the claims were timely filed, Plaintiff's claims fail because (1) the "note" is not an enforceable obligation, (2) Plaintiff was not a "seller" of securities and (3) Plaintiff did not rely on Defendant's advice in ultimately deciding to issue the disputed loan in the amount of $100,000.

## I.   BACKGROUND

### A.   The *Marlynx* Litigation

Plaintiff begins his response to Defendant's motion for summary judgment with the statement that "[t]he facts of this case have an existing litigation history in that a companion case involving the same issues is pending before Judge Friedman." Plaintiff refers to the case of *Marlynx Investments, LLC v. Plastics Recovery Systems Int'l, Inc., et al*, No. 07-cv-12296 (E.D. Mich.), a case set for trial on September 14, 2010 before United States District Judge Bernard A. Friedman. On December 12, 2008, Judge Friedman denied a motion to intervene, filed in that matter by Plaintiff in the case *sub judice*. This Court concludes that while the two cases involve some common background, they involve very different claims and substantively different facts. Thus,

2

while Plaintiff often "borrows" from opinions issued by Judge Friedman in the *Marlynx* case and frequently utilizes deposition testimony given in that case, the case currently before this Court must stand or fall on its own facts, which differ in significant respects from those before the court in *Marlynx*.

Plaintiff in *Marlynx* is an LLC whose two members are Mark C. McQuiggan (the Defendant in the instant matter) and his wife. *Marlynx* filed suit in May, 2007, against Plastic Recover Systems International ("PRSI"), along with successor corporations to PRSI, as well as several individual defendants, including Raymond Michael, a known venture capitalist who became the President of PRSI. Mr. Michael is alleged to have been the "mastermind" of a securities fraud "Ponzi" scheme, involving in part solicitations to invest in PRSI. Marlynx also sued Stanley J. Targosz, the Third Party Defendant in the instant matter, and the inventor of the "plastic removal system" that was to begin nascent testing through the financial support of PRSI. Mr. Targosz, an inventor and not a business man, sought Mr. Michael's assistance in raising capital to develop his plastic recovery system. "Targosz believe[d] that he ha[d] invented a system to claim paint off of plastic parts, thereby rendering reusable parts otherwise destined for scrap." (*Marlynx, supra* No. 07-cv-12296, Dkt. No. 85, Order Granting in Part and Denying in Part Plaintiff's Renewed Motion for Partial Summary Judgment, p. 1-2.)

According to the facts in *Marlynx*, PRSI created a 29-page power point presentation which touted the plastic recovery system and on which Marlynx relied in deciding to invest $200,000 in the PRSI venture. Marlynx loaned a total of $200,000 to PRSI, and in return received two $100,000 Promissory Notes bearing an interest rate of 24% and promising annual payments of $24,000. (Def.'s Mot. Ex. 1.) Both of the notes that are the subject of the *Marlynx* litigation differ

significantly, both in content and in the form of execution, from the promissory note relied upon by Plaintiff in the instant matter. Both notes in the *Marlynx* litigation are identical; three pages long, and are signed by Raymond Michael, the president of PRSI, and witnessed by Terry Wallace, an associate of Mr. Raymond. Marlynx also had invested in another Raymond entity, Management Consultants Inc. ("MCI"), which was the subject of a cease and desist order entered by the State of Michigan Office of Financial and Insurance Services on matters unrelated to the *Marlynx* litigation. (*Id*. at 2.)

In fact, or so it is alleged in *Marlynx*, Marlynx was never paid a penny on its loans to PRSI, and Mr. Michael never intended PRSI to be profitable or to pay on the promissory notes. Mr. Michael allegedly used the monies obtained as loans to PRSI for purposes unrelated to the business of PRSI and ultimately left the country with the balance of the funds loaned by Marlynx and other investors. It is alleged that Stanley Targosz was unable to confirm that Mr. Michael had "taken the money" until February 2006 and did not inform investors in PRSI of Mr. Michael's bad faith actions until the spring of 2006. (Order Gr. in Part Pl.'s Mot. Summ. Judg., *Marlynx, supra*, 07-cv-12296, Dkt. No. 85, p. 3.)

The complaint in *Marlynx* alleges that the promissory notes were securities and were sold in violation of the Securities Acts of 1933 and 1934. In ruling on Marlynx's motion for partial summary judgment, Judge Friedman agreed that the notes in that case, which the court concluded were issued to investors who sought to purchase an investment in the business enterprise of PRSI with the expectation of a profitable return on their investment, were securities subject to the requirements of the Securities Act of 1933. (*Id*. at 4-8.) The court in *Marlynx* concluded that questions of fact existed as to whether the notes were sold in violation of the registration

4

requirements of the 1933 Act and whether the memorandum provided to potential investors contained material misstatements in violation of § 10b of the Securities Act of 1934. (*Id.*)

**B.  The Instant Case - Plaintiff's Claims Against Dr. McQuiggan**

**1.  The allegations of the Complaint.**

Plaintiff claims that Defendant Mark McQuiggan, "acting as an agent for and on behalf of PRSI, sold Plaintiff an investment note for $100,000 wherein Plaintiff was a lender and PRSI the borrower which note was to pay 48% interest." (Compl. ¶ 3.) Plaintiff claims that his action is to "recover the $100,000 paid by Plaintiff based upon his reliance of [sic] representations by Defendant that a Raymond V. Michael, President and 50% owner of PRSI . . . was a legitimate and trustworthy entrepreneur and could be relied upon." (Compl. ¶ 6.) Plaintiff claims that "[t]hese and other representations made by Defendant were false and Defendant either knew or should have known that they were false." (*Id.*) Plaintiff claims that his note, like the notes in the *Marlynx* case, is a security that was given solely as an investment for profit and that therefore Defendant violated the securities laws in offering the note to Plaintiff for sale without proper registration and for making certain alleged misstatements in connection with that offering. (Compl. ¶¶ 20-26.)

Plaintiff claims that he only gained knowledge of his claims against Defendant in 2008, through discovery in the *Marlynx* litigation, which allegedly disclosed that Defendant was a willing and knowing participant, along with Raymond Michael, in the "Ponzi" scheme described in the *Marlynx* litigation. Plaintiff claims that he only learned in 2008 that Defendant was promised a commission of three percent to help sell the investments of PRSI. (Compl. ¶¶ 9-10.) Specifically, Plaintiff claims that Defendant falsely represented to Plaintiff "that Ray Michael could be depended upon to keep his promises" and failed to inform Plaintiff that the notes were securities required to

be registered under applicable securities laws and that the notes were dependent upon PRSI receiving enough money from Ray Michael and MCI to complete construction and operation of a full plastics recovery line." (Compl. ¶ 18.) Plaintiff claims that he "relied on the untrue statements and assurances of Defendant in making his investment/loan to PRSI." (Compl. ¶ 19.)

## 2. Defendant introduces Plaintiff to the PRSI investment and Plaintiff conducts his own "due diligence."

Plaintiff and Defendant are both medical doctors; Plaintiff is a plastic surgeon and Defendant a urologist. (Def.'s Mot. Ex. 4, Deposition of Robert A. Forte, taken in *Marlynx Investments, LLC v. Plastic Recovery Systems Int'l Inc.*, No. 07-cv-12296 (E.D. Mich.), June 5, 2008 ("Forte I"), p. 6.) Plaintiff and Defendant first met in 1984 when Plaintiff was a general surgery resident and Defendant was his supervising doctor on his urology rotation. (*Id.* at 6-7.) Although acquaintances, Plaintiff and Defendant were not particularly close and were not social friends. (*Id.* at 53-54.) Both Plaintiff and Defendant also are acquainted with Third Party Defendant, Stanley Targosz, whom Plaintiff has known since they attended Catholic Central High School together approximately 20 years ago. (*Id.* at 7.) Plaintiff and Targosz continue to serve together on several Catholic Central committees, "have become very good friends," see each other socially and are "very close because of what [they] do at Catholic Central." (*Id.* at 7, 57.)

Plaintiff first considered the idea of taking a financial stake in PRSI sometime in the early Fall of 2005 when Defendant and he were talking in the hallway outside the operating room at Providence Hospital. (*Id.* at 8, 9.) Defendant asked Plaintiff if he knew Stanley Targosz and Plaintiff responded that he knew him well, explaining their common tie to Catholic Central. Defendant explained that Targosz was "spearheading" the plastics recovery system and asked Plaintiff if he would be interested in learning more, to which Plaintiff responded yes, he "would be

interested in listening to an idea like that." (*Id.* at 8.)  Plaintiff testified that he was "very intrigued by the idea" because he was "a chemistry major, and [understood] the difficulty of reclaiming plastic that's identical." (*Id*. at 9.)  According to Plaintiff, after Plaintiff expressed his interest in listening to the PRSI idea, Defendant said to him: "*Oh, good, I'll get my commission*." (*Id*. at 8) (emphasis added.)  Plaintiff testified that at the time he didn't really give this comment much thought. (*Id*. at 9.)  At the hearing on the instant motion, counsel for Plaintiff acknowledged this testimony given by his client and admitted that his client was aware in the Fall of 2005, when Plaintiff first introduced the idea of PRSI to him, that Defendant stood to receive a commission if Plaintiff decided to invest in PRSI.

Following this initial introduction, Plaintiff testified that he attended perhaps two more meetings to discuss PRSI at which Defendant was present, but that he never met again just with Defendant.  The meetings thereafter were always attended also by Raymond Michael and sometimes Stanley Targosz. (*Id*. at 9-10.)  According to Plaintiff, Defendant placed a follow-up call to Plaintiff sometime later in the Fall to ask if Plaintiff was ready to make a financial commitment.  Plaintiff explained to Defendant that he was still doing his own due diligence and would not be rushed in to making a decision.  Defendant called Plaintiff later that day to tell him to take all the time he needed to make his decision. (*Id*. at 10-11.)  Plaintiff testified that "[o]ther than the two times we would have meetings where Ray Michael was present, I probably never saw Dr. McQuiggan or spoke to him, other than that one conversation on the phone, other than to say, I'll meet you at such and such a place, at the Bingham Farms office, at 7:00." (*Id*. at 41.)

Plaintiff states that Defendant indicated that he was very confident in the advice he had been given by Raymond Michael in the past, that he had invested with him before (which he had in MCI)

and that Michael had seemed to be "right on." (*Id*. at 14, 41.) Plaintiff stated that he believed that Defendant was in fact receiving some return on his other investments with Raymond Michael and had no reason then or now to question the truth of Defendant's representations regarding the success of his previous investments with Raymond Michael. ( Def.'s Mot. Ex. 5, Deposition of Robert A. Forte, October 12, 2009, ("Forte II") pp. 20-21.)

Plaintiff had no further contact with Defendant regarding his decision to make a financial commitment to PRSI but did proceed with his own due diligence and research into the viability of the PRSI concept. Plaintiff's "due diligence" involved consulting as many people as necessary "until [his] comfort level is raised to the point where [he] can say yes or no." (Def.'s Mot. Ex. 4, Forte I, 59-60.) At no point did Plaintiff consult Defendant during his due diligence and Plaintiff did not consider Defendant his advisor on the decision to invest. (*Id*. at 71.) "My due diligence consisted strictly of dealing with people outside of the group that I was going to invest with." (*Id*. at 82.) Plaintiff viewed Defendant as merely "another investor" in the deal and specifically testified that he "didn't rely upon Dr. McQuiggan at all for any investment advice with regard to PRSI." (*Id*. at 80-81.)

Plaintiff did consult an individual who was an accountant and a lawyer and asked him his advice on making a financial commitment to PRSI. The advisor told Plaintiff that he knew and did not like Raymond Michael and told Plaintiff not to invest in PRSI. Plaintiff expressly stated that he consciously disregarded this advice in deciding ultimately to invest in PRSI. (*Id*.) In fact, Plaintiff disregarded the advice of two independent individuals who categorically told Plaintiff "don't do it" and "made the decision on [his] own in spite of having received the advice not to do it, to go ahead and do it[.]" (Def.'s Mot. Ex. 5, Forte II, 16-19.)

Plaintiff decided to invest in PRSI because of his interest in the "revolutionary" concept of reclaiming plastic regardless of the advice that he was being given by independent professionals, at least one of whom specifically informed Plaintiff not to trust Raymond Michael, and not to invest PRSI. (*Id*. at 19.) Plaintiff based his decision to invest, and to ignore counsel to the contrary, on his close relationship with Stanley Targosz: "What I can tell you is this: I never trusted Mr. Michaels. The only reason I invested in the first place and have continued to invest is because of Mr. Targosz. That's who I trusted." (Def.'s Mot. Ex. 4, Forte I, p. 76.) Plaintiff stated that while Defendant introduced him to the PRSI idea, Defendant had no further influence on Plaintiff's decision to ultimately invest: "[I]f Mr. Targosz had not been involved in this deal, I would not have invested because I did not trust Mr. Michaels from the very beginning." (Def.'s Mot. Ex. 5, Forte II, p. 16-19.) Plaintiff never shared his thoughts about Raymond Michael with anyone, including Defendant, except his wife to whom he expressed the fact from the "very beginning" that he did not trust Raymond Michael. (*Id*.)

### 3.     Plaintiff loans PRSI $100,000 in exchange for an unsigned promissory note guaranteeing a per annum interest rate of 24%.

Plaintiff concedes that the Promissory Note ("the Note") on which he relies in this case, in the amount of $100,000, bearing interest per annum of 24% and designating Plaintiff as payee and PRSI as the debtor, was not signed by Defendant and was never drafted for Defendant's signature. (Def.'s Mot. Ex. 1.) Sometime around January 18, 2006, Plaintiff received the Note, by his recollection from Raymond Michael. (*Id*. at 22-23.) Stanley Targosz testified that he actually signed and delivered the Note to Plaintiff "as a receipt for the PRSI check which [he] delivered to Ray Michael." (Def.'s Mot. Ex. 3, Pl.'s Resp. to Def.'s First Discovery Requests; Pl.'s Resp. Ex. D, Deposition of Stanley Targosz, October 17, 2007, 34-35.) The Note bears a signature line

indicating it was to be executed by Raymond Michael, the President of PRSI, who never signed the document. Instead, Stanley Targosz signed his name on the document below the line indicated for Raymond Michael's signature. Although Targosz was a Vice-President of PRSI, that was not noted anywhere on the Note.

The details of how the Note came to be executed and delivered remain unknown. Plaintiff recalled that the Raymond Michael delivered the Note, which is directly contradicted by Stanley Targosz's statement, quoted above, that he delivered the Note to Plaintiff. (Def.'s Mot. Ex. 5, Forte II, p. 22.) Plaintiff seemed not to have noticed the "detail" of the absence of the signature of Raymond Michael: "Q: Can you explain why you took a promissory note for $100,000 that was not signed? A: I just told you it was signed. Q: But not on the signature line and you can't tell by whom. A: Correct." (Def.'s Mot. Ex. 5, Forte II, p. 25.) In fact, Plaintiff testified that he did not receive the Note the day he handed over the check and can't remember exactly when he did receive the Note, except that it was not simultaneous with delivery of the check. (*Id*. at 26-27.) Plaintiff no longer asserts that Defendant McQuiggan had anything to do with delivery or execution of this improperly executed Note, which bears fax notations that indicate it was sent to Plaintiff from Stanley Targosz place of business.[2] (*Id*. at 27-28.) Plaintiff never contacted Defendant to inquire

---

[2]  Indeed, Plaintiff's steadfast refusal to admit that this was the only Note that he possessed evidencing his "investment" in PRSI, and his refusal to admit that he did not possess a properly executed promissory note which in any way indicated Defendant's involvement in the transaction, were the subject of at least two motions to compel before Magistrate Judge Morgan who ultimately imposed sanctions: "With respect to Plaintiff's conduct, Plaintiff has repeatedly failed to produce documents essential to his claim and finally concedes that with respect to the promissory note, no properly signed note was every in existence." (Dkt. No. 30, Order Granting Mot. for Discovery Sanctions, pp. 2-3.) This Court affirmed the Magistrate Judge's imposition of sanctions (Dkt. No. 37) and ultimately awarded sanctions in the form of attorneys' fees in the amount of $9,940, payable to Defendant (Dkt. No. 39.)

why the Note was not signed by Mr. Michael and never contacted Mr. Michael or PRSI to obtain a properly executed note.  (*Id.* at 29.)

Plaintiff testified that it was his understanding that the $100,000 loan was never intended to be an investment in the long-term venture of PRSI, but that the $100,000 was to be used to set up a "test line" for what would ultimately become a much more productive venture, a separate company, in which he might ultimately enjoy franchise rights:

> Q: So what is it that you were going to do – what activities were you going to perform besides turning over a hundred thousand dollars and making sure the check was cashed by your bank?
>
> A: I was going to be a further investor in the company. . . . [T]he test line would set the stage for the real business, which was setting up more lines.  And the word franchise was used, and I wanted a franchise.

(Def.'s Mot. Ex. 4, Forte I, 69-70.)  Plaintiff explained that PRSI was never intended to pay any money as a profit-making investment:

> Q: The first company was what?
> A: PRSI.
> Q: And that was going to set up the test line?
> A: Yes.
> Q: Did it, yes or no?
> A: Yes.
> Q: So it succeeded?
> A: Yes.
> Q: But it didn't pay any money, did it?
> A: No.
> Q: Why didn't it pay any money?
> A: It was never intended to. The only money that you were going to recover from that was the 24 percent.

(Def.'s Mot. Ex. 5, Forte II, p. 34.)  This was confirmed by Stanley Targosz in his response to Defendant's requests to admit: "PRSI never intended to pay beyond the amount due on the note because that was the extent of our obligation."  (Def.'s Mot. Ex. 3, p. 2.)

**4.      Plaintiff allegedly discovers that Defendant was a "salesperson" for PRSI and claims to have been duped by Defendant into "investing" in PRSI.**

Plaintiff does not dispute the drafting and execution errors relating to the Note and attempts to justify the circumstances under which the Note came to be signed by Mr. Targosz:

> Stanley Targosz was asked by Raymond Michael, the President of PRSI, to "pick up" Plaintiff's check, which he did in the amount of $100,000.  Made payable to PRSI. (Pages 34, 35 Targosz Dep. Trnscpt. Ex. D) In exchange for the check Plaintiff received a note that had been prepared for Mr. Michael's signature as president of PRSI and was attached to Plaintiff's complaint. (Exhibit E.) Stanley Targosz, a vice president of PRSI, signed it under the place on the note reserved for Michael's signature, Mr. Michael never signed it.  He did however deposit Plaintiff's $100,000 in the PRSI account and only Mr. Michael and his wife had authority to sign the check on that account. (See transcript testimony of Ms. Clora, Comerica Bank pp 8,9, Ex. F.)

Pl.'s Resp. to Mot. Sum. Judg. 4-5.  Plaintiff claims that despite the fact that Defendant admittedly had nothing to do with delivery, execution or drafting of the note, he should nonetheless be held liable on the note because he was an agent of Raymond Michael: "Now Defendant wants to avoid the legal implications of being a paid salesman of an unregistered security because his principal neglected or refused to sign the note but kept the money."  (*Id.*)

Plaintiff testified in his deposition that the very first day that Defendant mentioned the PRSI investment to Plaintiff, sometime in the Fall of 2005, Defendant told Plaintiff that if Plaintiff invested, Defendant would receive a commission. (Def.'s Mot. Ex. 4, Forte I, 8.) Plaintiff's counsel acknowledged at the hearing on this matter that his client knew at that time that Defendant stood to receive a commission based upon Plaintiff's investment.  In spite of this acknowledgment, Plaintiff alleges now that he only recently learned that Defendant actually may have received that commission.  Plaintiff now alleges that Defendant was an "agent" of PRSI and/or Raymond Michael based upon the following facts which he claims to have learned through discovery in the *Marlynx*

litigation: (1) Defendant attended five sales meetings to learn how to "sell" the PRSI product (no source cited); (2) Defendant shared an office with Terry Wallace, an employee of Raymond Michael's, who testified that Defendant came to the PRSI/MCI office approximately once a week and made phone calls to prospective clients about investing in PRSI (Pl.'s Resp. Ex. J, Deposition of Terry Wallace in the matter of *Marlynx Investments, LLC v. Plastic Recovery Systems Int'l Inc.*, No. 07-cv-12296 (E.D. Mich.), Sept. 25, 2008, pp. 13-16; Def.'s Mot. Ex. 9, Wallace Dep. 16.); (3) Defendant was promised a three percent commission if he brought an investor into Raymond Michael. (Pl.'s Resp. Ex. K, Deposition of Mark C. McQuiggan, April 15, 2008, pp. 93-96.) Defendant testified that he never actually received a commission and Mr. Wallace confirmed that Defendant never received a commission. (Pl.'s Resp. Ex. K, McQuiggan Dep. 94-96; Def.'s Mot. Ex. 9, Wallace Dep. 16.) Plaintiff states that a $3,000 payment received by Defendant's LLC, Marlynx, from MCI, approximately two weeks after Plaintiff issued his $100,000 loan to PRSI, is evidence that Defendant in fact received his 3% commission for the sale of an interest to Plaintiff. (Pl.'s Mot. Ex. N.) Defendant states that this was the last payment that Marlynx received in connection with its investment in MCI and was not a commission on a sale of PRSI. (Pl.'s Resp. Ex. M, Deposition of Mark C. McQuiggan, October 12, 2009, pp. 14-15.)

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on

which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## III. ANALYSIS

### A. Plaintiff's Claims are Barred by the Applicable Statutes of Limitations

Both parties appear to agree that the applicable statute of limitations for Plaintiff's Count I claim is set forth in 15 U.S.C. § 77m, which provides:

> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is one to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), the Supreme Court adopted this same statute of limitation (one year period of limitation/three year period of repose) for claims based upon section 10b of the Securities Exchange Act of 1934, 17 C.F.R. §240.10b-5 (Count II of Plaintiff's Complaint). *Lampf* was superceded by the passage of section 804 of the Sarbanes-Oxley Act, which increased the time limitation periods for securities fraud claims to a two year/five year scheme. 28 U.S.C. § 1658(b). *See In re Exxon Mobil Corp. Securities Litigation*, 500 F.3d 189 (3rd Cir. 2007) (explaining the effect of Sarbanes-Oxley on the Supreme Court's decision in *Lampf*). Some have argued that section 804 of Sarbanes-Oxley has a much broader reach and applies to other securities laws, even those which expressly contain their own statutes of limitation. *See* Gann, E.,

*Judicial Action in Retrograde: The Case for Applying Section 804 of the Sarbanes-Oxley Act to All Fraud Actions Under the Securities Laws*, 72 U. Cin. L. Rev. 1043 (2004). However, several courts have refused to extend Sarbanes-Oxley to claims under the 1933 Act. *See In re Fleming Companies Inc. Securities & Derivative Litigation*, MDL 1530, 2004 WL 5278716 at * 46 (E.D. Tex. Jul. 16, 2004) ("The Sarbanes-Oxley Act does not extend the limitations period for the 1933 Act claims to two years."); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003) (rejecting the argument that the Sarbanes-Oxley limitations period applies to 1933 Act claims.); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 974-75 (W.D. Wis. 2003) (holding the same.)

Whether analyzed under a one year/three year or a two year/five year scheme, Plaintiff's claims in the instant matter are barred by the statute of limitations. Even assuming that Plaintiff could make out a *prima facie* case of a violation of either 15 U.S.C. § 77l or Section 10-b, there is no question that Plaintiff either knew or should have discovered in the exercise of reasonable diligence, in the spring of 2006, all of the facts necessary to have pled his claims. He did not file this action until well over two years later, on December 12, 2008.

While not entirely clear from the face of Plaintiff's Complaint, Plaintiff's responsive brief clarifies that Plaintiff asserts claims under 15 U.S.C. §§ 77l(a)(1) and 77l(a)(2) of the Securities Act of 1933. (Pl.'s Resp. 10.) Section 77l provides in pertinent part as follows:

> (a) In general
> Any person who--
> (1) offers or sells a security in violation of section 77e of this title, or
> (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to

state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l. Section 77e, referred to in 77l(a)(1), sets forth the registration and prospectus requirements for certain securities. A non-owner of a security may be considered a "seller" under the Act, and may be liable under the act, if he engages in actual solicitation and urges a prospective purchaser to buy for purposes of gaining a personal financial benefit or serving the financial interests of the securities owner. *See Pinter v.* Dahl, 486 U.S. 622, 654 (1988) (typically, a person who solicits a purchase will have sought or received a personal financial benefit such as a commission or served the financial interests of the owner); *Smith v. American Nat'l Bank and Trust Co*., 982 F.2d 936, 941 (6th Cir. 1992) (the fact that a non-owner stands to benefit from the sale not sufficient without proof that he urged the prospective purchaser to buy).

The elements of federal securities fraud action under Section 10-b, Rule 10b-5, are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation. *Brown v. Earthboard Sports USA, Inc*., 481 F.3d 901, 917 (6th Cir. 2007).

Even assuming: (1) that the Note was a security; (2) that it was required to be registered under section 77e; (3) that Defendant was a "seller" of securities; (4) that Defendant made an untrue statement of material fact or omitted to state a material fact which mislead Plaintiff; (5) that Plaintiff

17

relied on the statement or omission; and (6) Plaintiff suffered a loss,[3] there is no question that

Plaintiff knew, or in the exercise of reasonable diligence should have known, at least by the spring

of 2006, all of the facts necessary to plead his claim for securities fraud.  Yet Plaintiff waited well

over two years to file his suit and filed it not against the alleged issuer of the security (PRSI) or

against the man who absconded with his money (Raymond Michael) or against his good friend to

whom he actually gave the $100,000 (Stanley Targosz), but against a fellow investor, who shared

his enthusiasm for PRSI with Plaintiff and who happened to be suing Plaintiff's good friend Stanley

Targosz, and others, for his own lost investment in PRSI.

      The uncontested facts are that: (1) Plaintiff knew "from the start," presumably meaning from

the time that Defendant introduced the idea of investing in PRSI, that Raymond Michael was not to

be trusted (Def.'s Mot. Ex. 4, Forte I, p. 76); (2) Plaintiff was informed by his good friend Stanley

Targosz in the Spring of 2006 that Raymond Michael had taken all of the money that Plaintiff had

---

[3]  Although the statute of limitations argument is clearly dispositive of Plaintiff's claims against Defendant, the Court notes that Plaintiff would face additional serious challenges in establishing a *prima facie* case under either the 1933 Act or Section 10-b against Defendant.  First, Plaintiff's claims fail because Plaintiff has not produced an enforceable promissory note. *See Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 691 (7th Cir. 1991) ( "a 'contract' for purposes of the securities laws means an enforceable contract.").  Plaintiff has failed to produce an enforceable agreement evidencing his payment to PRSI of $100,000 and PRSI's agreement to repay that amount or to pay Plaintiff interest on such a note.  Second, Plaintiff has produced no evidence that he in fact relied in any way on any statements made by Defendant in connection with Plaintiff's ultimate decision to invest in PRSI.  Plaintiff's own testimony directly contradicts any assertion that he relied on Defendant's advice in any respect.  Plaintiff was clear in his testimony that he relied on his own due diligence, which did not involve consultation with Defendant, and on his relationship with Stanley Targosz.  Moreover, Plaintiff admitted that he himself did not trust Raymond Michael from the start and conceded that he ignored the advice of an accountant and a lawyer who advised against investing with Raymond Michael.  Thus, even assuming that Defendant did represent to Plaintiff that Raymond Michael could be trusted, this statement could not possibly have been material to Plaintiff's decision to invest when Plaintiff himself, at the time, knew this statement to be false. Thus there is no evidence that the statements alleged to be false were either material to or relied upon by Plaintiff in making his decision to invest in PRSI.

invested in PRSI, that the entire investment was lost, and that Raymond Michael was a thief and had stolen his money (Def.'s Mot. Ex. 2, Targosz Dep. 46-48); (3) Plaintiff knew from the moment that Defendant introduced the PRSI investment that Defendant stood to make a commission if Plaintiff invested in PRSI (Def.'s Mot. Ex. 4, Forte I, 8); (4) Plaintiff did not rely on Defendant in deciding to loan money to PRSI but conducted his own due diligence and ultimately relied on his relationship with Stanley Targosz (Def.'s Mot. Ex. 4, Forte I, 71, 80-82).

While Plaintiff claims that he only learned sometime in 2008 that Defendant may have earned a commission on Plaintiff's investment in PRSI, Plaintiff testified that Defendant informed him the very first time they spoke about PRSI that Defendant was going to earn a commission if Plaintiff decided to invest in PRSI. There is no question that it was fully disclosed to Plaintiff that Defendant was potentially a salesperson for PRSI. Plaintiff clearly knew, then, in the Fall of 2005, when Plaintiff first spoke to him about PRSI, that Defendant would potentially earn a commission as a salesperson for PRSI. Certainly by the spring of 2006 (and probably earlier based on Plaintiff's testimony as to his own intuitions) when Plaintiff was informed by his good friend Stanley Targosz that Raymond Michael had absconded with the PRSI money, Plaintiff knew that Raymond Michael was not someone to trust and should have realized then that he had a claim against the Defendant, if in fact he had relied on Defendant's alleged representations about Michael's trustworthiness in deciding to loan $100,000 to PRSI. Despite this knowledge, Plaintiff did not seek to vindicate his rights until well over two years later, filing this case on December 18, 2008. Both Counts of Plaintiff's Complaint are therefore barred by the applicable statute of limitations.

## B.    Defendant's Request for Sanctions

Defendant seeks an award of costs, expenses and fees pursuant to 28 U.S.C. § 1927, based

upon Plaintiff's unreasonable and vexatious pursuit of his claims against Defendant. As Magistrate Judge Morgan observed in her opinion awarding sanctions against Plaintiff for his discovery violations, it appears possible that this suit was initiated in retaliation for the claims asserted by Defendant's LLC, Marlynx, against Plaintiff's good friend Stanley Targosz and others, in the *Marlynx* litigation. Were this established beyond question, Defendant would be entitled to sanctions. "In order to award attorneys fees under the bad faith exception, a district court must find the 'the 'claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for a improper purpose such as harassment." *First Bank of Marietta v. Hartford Underwriters Inc. Co*., 307 F.3d 501, 512 (6th Cir. 2002).

While Plaintiff has admitted that there never was an enforceable promissory note in this case and admits that he did not rely on Defendant's advice or counsel in deciding to loan $100,000 to PRSI, the Court has already awarded discovery sanctions against Plaintiff in a significant sum, which Defendant's counsel indicated at the hearing in this matter has been paid. Further sanctions, under these circumstances, are not warranted.

## IV.    CONCLUSION

The Court GRANTS Defendant's Motion for Summary Judgment (Dkt. No. 27) and DISMISSES this action WITH PREJUDICE, including the claims stated in the Third-Party Complaint against Third-Party Defendant Stanley Targosz, which necessarily terminate as a result of the Court's dismissal of Plaintiff's claims against Defendant.

IT IS SO ORDERED.

Dated:  August 30, 2010                    S/Paul D. Borman
                                           PAUL D. BORMAN
                                           UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 30, 2010.

S/Denise Goodine
Case Manager